Filed 7/10/24  P. v. Anguiano CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORGE HUMBERTO ANGUIANO,<br><br>    Defendant and Appellant. | A166206<br><br>(Contra Costa County<br>Super. Ct. No. 05001512474) |

Defendant Jorge Humberto Anguiano pleaded guilty to voluntary manslaughter with a firearm enhancement in 2017.  In appealing the trial court's denial of his recent petition for resentencing pursuant to Penal Code section 1170.95,[1] defendant makes three contentions:  (1) there was insufficient evidence to support the resentencing court's finding beyond a reasonable doubt that he is guilty of murder under the current law; (2) the court improperly relied on inadmissible evidence; and (3) the court failed to

---

[1]    All further undesignated statutory references are to the Penal Code.
    Defendant filed this petition pursuant to section 1170.95, but section 1170.95 has since been renumbered to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  As such, we will refer to section 1172.6, but also refer to section 1170.95 as necessary to conform to the record.

consider his youth in determining whether he acted with malice. Though we reject the first two contentions, we conclude a reversal and remand is required so the court may consider defendant's youth in determining whether he acted with malice.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2015, the People charged defendant, Edwin Piedra Rodriguez, and Jose De Jesus Hernandez by information with conspiracy to commit a felony by active street gang participants (§ 182.5; count 1), and with the murder of Rogelio Montelongo (§ 187; count 2). With regard to both counts, the People alleged firearm enhancements (§ 12022.53, subds. (b)–(e)(1)) as to each defendant, and also alleged they committed the murder for the benefit of, at the direction of, and in association with a criminal street gang, namely, the Norteño criminal street gang (§ 186.22, subd. (b)(1)). In 2017, defendant pleaded guilty to one count of voluntary manslaughter (§ 192, subd. (a)) and admitted a personal firearm use enhancement (§ 12022.5, subd. (a)). The trial court sentenced defendant to a total of 21 years in prison.

In 2022, defendant filed a petition for resentencing pursuant to former section 1170.95. Defendant's petition indicated that a charging document filed against him allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine, or another theory of imputed malice; he was convicted of manslaughter; and he could not now be convicted of murder. The trial court subsequently appointed defendant counsel and later issued an order to show cause.

Over the course of two days in September 2022, the trial court held a hearing to determine whether the defendant was entitled to relief (§ 1172.6, subd. (d)(3)). The People's evidence included defendant's rap sheet for the limited purpose of establishing what he pleaded to in this case, and the

2

victim's death certificate showing he died of multiple gunshot wounds to the abdomen. The People also asked the court to take judicial notice of the court file showing what defendant and his co-defendants pleaded to. The People additionally presented the following witness testimony.

On August 26, 2012, Graciela V. was inside her home on Emeric Avenue near 23rd Street, when she heard four to five gunshots. She saw a young Hispanic male, very thin and not very tall, running in front of her house with a small gun in his hand. The man was running westbound on Emeric Avenue towards 21st Street.

On August 26, Margarita S. was outside her house when she heard about six gunshots. Around three minutes later, she saw a young, skinny, light skinned male in a black hoodie running down Emeric Avenue then turn onto 21st Street. He bumped into her and told her to "Move, move." The man was putting a gun into the front pocket of his hoodie and then ran down California Avenue toward 23rd Street. Subsequently, two older men ran up to her and said the person just killed someone.

On August 26, Maria G. was in her car parked in an alley between Emeric Avenue and California Avenue off of 23rd Street when she heard gunshots. Then she saw a young man running on 23rd Street toward Richmond High School and getting into a car. The man was around 20 to 22 years old, tall with a medium build and short hair. He appeared to be holding something on the left side of his waist, and he had a rosary-bead style necklace that he took off and threw on the ground. She remembered identifying someone in a photo lineup, but—on a scale of one to ten with " 'one' " being not sure at all and " 'ten' " being absolutely certain—she was a three.

On August 26, Mohammed Z. was working at a tire shop on the corner of 23rd Street and Emeric Avenue when he heard a "big bang." He went outside and saw a "larger" Hispanic man, about 20 to 25 years old, running on the opposite side of the street with a handgun in his hand, trying to put it in his pants. The man ran southbound on 23rd Street, toward Richmond High School and appeared to flag down and enter a car. Mohammed Z. walked into the street to see where the man came from and saw a body on the ground. He recalled telling the police that the man was wearing a red rosary.

Lieutenant Daniel Wiegers of the San Pablo Police Department—a detective at the time of the murder—arrived at the crime scene at around 12:30 p.m. the day of the murder and found the victim's blue shoes. At the hospital, he saw that the victim had multiple tattoos: a "VFL" tattoo on his left hand fingers; the number "13" on the inside of his left middle finger; the number "13" with three dots near his right shoulder; and a domino with the numbers " '1' " and " '3' " on each side of the domino. Wiegers observed the victim had gunshot wounds on both thighs, buttocks, neck, and in the stomach and upper abdomen area. Wiegers also attended the victim's autopsy and determined the victim had seven separate entry gunshot wounds. Two intact projectiles were recovered from the body at the autopsy, and two more at the scene; the bullets were approximately the size of .38 or .40 caliber rounds. At the victim's home was a drawing of the victim's left hand with "VFL" on the knuckles, photos of the victim with what appeared to be gang members throwing up gang signs, and a CD with "blue Sureño street gang raps."

Lieutenant Wiegers reviewed surveillance video from the tire shop on 23rd Street, which showed a Hispanic male running southbound down 23rd Street who appeared to be motioning someone down the street to pick him up.

4

About three days after the shooting, Wiegers helped search a Chevy Monte Carlo that belonged to co-defendant Rodriguez and found an iPhone that showed at the time of the murder several incoming and outgoing calls from a phone number that was ultimately linked to co-defendant Hernandez.

After defendant's name and telephone number became relevant to the investigation, Lieutenant Wiegers searched defendant's house and found his cell phone, which showed calls made to Hernandez's phone on the morning of the murder, and also calls with Rodriguez's phone. He also found a red hat with a black "huelga" bird and the words " 'Northern Cal' " on it, and red rosary beads on top of a dresser.

Detective Robert Brady of the San Pablo Police Department was a gang investigator who knew the victim had the moniker " 'Domino' " and was a member of a Sureño street gang known as "Varrio Frontero Loco" or "VFL." Around August 2012, there was an active and serious conflict between Norteño and Sureño street gangs, and Brady had assisted in investigating over a dozen murders between the gangs. Brady testified that perceived disrespect among gangs is often answered with violence, and he opined that this murder reflected a clear "disrespect" case.

Detective Brady testified that the area where the murder occurred was "claimed" by both Norteños and Sureños. After the murder, there was a memorial set up for the victim with tagging stating " 'RIP Domino' " and referencing VFL and other Sureño subsets. Around September 3, 2012, at another Sureño memorial for the victim, the tagging was crossed out and there was tagging that stated " 'WSB got one' " with a " '1' " and a " '4' " next to it.

Detective Brady reviewed relevant surveillance video and saw a potential suspect vehicle: a gold/silver 1990's model Chevy Monte Carlo with

large black rims.  He later observed that vehicle on the road and pulled it over.  Rodriguez was the driver.  Brady searched Rodriguez's home and found gang related items:  articles of red clothing, such as bandanas, and a t-shirt that had " 'West Side Berkeley' " (also referred to as "WSB") written on the front and "510" written on the back in red and black spray paint.

Detective Brady searched Hernandez's home and found at least one red bandana and gang tagging related to Norteños in his room and a backyard shed.  At defendant's home, police found a few pairs of red shoes, a black and red rosary, and red hats, including a red hat with a huelga bird and " 'Northern Cali' " on it.  Brady explained the huelga bird is an "identifier" commonly used by the Norteño street gang.

Co-defendant Rodriguez testified he was convicted of a crime that took place in August 2012.  At that time, he was driving a Chevy Monte Carlo with big rims.  On the morning of the crime, co-defendant Hernandez had sent him a text and called him, so Rodriguez went to his house and "everybody" was there.  After dropping Hernandez and defendant off close to a tire shop, Rodriguez went to a market.  Rodriguez heard gunshots as he was leaving the market.  When he picked up Hernandez and defendant, he had to drive fast because everybody was running and he did not know what had happened.  Rodriguez recalled Hernandez and defendant "saying" they tossed their guns after the shooting, though he later testified he probably just thought they tossed their guns.  Rodriguez testified he probably told the police that he thought Hernandez still had his gun, and recalled telling police that Hernandez left his gun with an uncle in Oakland.  At some point prior to the shooting, Hernandez had shown him a revolver.

Rodriguez thought Hernandez and defendant were going to fight someone, and he denied knowing they were going to shoot anyone.  Rodriguez

6

denied being affiliated with WSB, but acknowledged that WSB clothing was found at his home and that his older sister was associated with WSB. He testified he pleaded to a gang enhancement, and that in order to accept his plea, his co-defendants had to accept their plea offers, too. When asked if he recalled his statement to police that Hernandez was angry about someone throwing bottles at him, Rodriguez remembered Hernandez was angry, but not the part about bottles. Rodriguez thought Hernandez and defendant recognized the man who threw bottles at them because Hernandez "said he knew the guys." Rodriguez recalled telling the police that Hernandez thought he shot someone "in the ass," but he was not sure if Hernandez was serious.

Mark Galios, a former police officer with the San Pablo Police Department and the lead investigator and detective at the time of the murder, reviewed surveillance video from a tire shop on 23rd Street and identified the suspect vehicle: a gold, gray Chevy Monte Carlo with large black rims. He also saw in the videos associated with the case that three people were in the suspect vehicle. He spoke to Rodriguez, who admitted driving defendant and Hernandez to the area of the crime that day and knew the two were going there to "do some business." Rodriguez explained that the Friday before the shooting, he was with Hernandez and defendant when bottles were thrown at them from a moving car. Hernandez was very upset because his small child was with them. Hernandez and defendant knew the responsible person hung out in the "23rd Street area." Rodriguez said Hernandez and defendant both stated they tossed their firearms after the shooting.

Galios spoke to Maria G. who described the person that she saw running from the scene wearing rosary beads. Maria G. identified defendant

7

in a photo lineup as the person that she saw, but said she was only 30 percent sure. During the investigation, Galios found a text message in defendant's cell phone asking, "You finna be getting out of the Rich?" To this, defendant responded, "Trying to. I got nowhere to go, period. 187."

Galios testified that no bullet casings were recovered at the crime scene, though a semiautomatic firearm expels casings after being fired. Standard revolvers hold six rounds; some larger caliber revolvers hold five rounds. In the course of his investigation, he listened to audio from a "ShotSpotter" system set up in San Pablo and Richmond and heard eight shots fired.

Defendant presented no witnesses but introduced a map of the area around 23rd Street and Emeric Avenue. The defense, with the assent of the People, introduced into evidence a video recording of a police interview of Rodriguez. Among other things, Rodriguez told police that he dropped off defendant and Hernandez at Emeric Avenue and Hayes Street knowing they were going to shoot someone. Rodriguez said he knew this based on the way the two were dressed, and that defendant had a "40 Glock" and they told him they were going to do "business." After the shooting, Rodriguez first picked up defendant, who told him to pick up Hernandez. Defendant told Rodriguez that he threw out his gun and that he fired three or four shots from far away but his gun jammed. Hernandez said he used his revolver and came back with no bullets; Hernandez also said he thought he shot the victim "in the ass." Rodriguez thought Hernandez probably still had the gun with him after the shooting and left it with a family member. Rodriguez told the police that the shooting occurred because someone threw bottles at him, defendant, Hernandez, and Hernandez's young child, while they were walking on the Friday before the shooting.

At the conclusion of the hearing, the trial court denied the petition upon determining the evidence showed, beyond a reasonable doubt, that defendant was guilty of murder either as an actual killer or as an aider and abettor. This appeal followed.

**DISCUSSION**

**A. General Principles**

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) which "eliminated the natural and probable consequences theory of liability as a basis for a murder conviction." (*People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).) It did so by amending section 188 to provide that "except in cases of felony murder, 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought.' (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.)" (*Reyes*, at p. 986.)

Additionally, Senate Bill 1437 added section 1170.95 (now section 1172.6), which "provide[d] a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) In 2021, the Legislature enacted Senate Bill No. 775 (2021–2022 Reg. Sess.), which clarified that the law also applied to "persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine." (Stats. 2021, ch. 551, § 1, subd. (a).) In its current form, section 1172.6 provides that a petitioner must make a prima facie showing that: (1) a charging document was filed that "allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine"; (2) "[t]he petitioner was convicted of murder, attempted murder, or manslaughter

9

following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder"; and (3) "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).)

Where a petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an order to show cause then hold "a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subds. (c), (d).) At the hearing stage, the court may generally consider evidence previously admitted at any prior hearing that is currently admissible, and the parties may "offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

### B. Sufficiency of the Evidence

Defendant argues the evidence was insufficient to support a finding beyond a reasonable doubt that he is guilty of murder under current law. We disagree.

"Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances

10

attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*).) Case law explains that "[m]urder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra,* 14 Cal.5th at p. 988.)

"All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Gentile, supra,* 10 Cal.5th at p. 843; *People v. Beeman* (1984) 35 Cal.3d 547, 561.) " '[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes, supra,* 14 Cal.5th at p. 991, italics omitted.)

We review the denial of a section 1172.6 petition for substantial evidence. (*Reyes, supra,* 14 Cal.5th at p. 988.) Under that familiar standard, we review the record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value

11

that supports a finding of guilt beyond a reasonable doubt. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

Here, the record contains ample evidence substantially supporting defendant's guilt as a direct aider and abettor to the murder who, at the very least, acted with implied malice. As described in detail above, multiple eyewitnesses connected defendant directly to the crime. (*Ante*, at pp. 3–4.) After the gunshots, eyewitnesses saw a young, thin Hispanic male with a gun and a larger Hispanic man with a gun and wearing a red rosary run from the crime scene. Maria G., identified the larger man in a photo lineup as defendant. Both Mohammed Z. and Maria G. saw the larger man get into a car. Mohammed Z. saw a body on the ground where the larger man came from. Surveillance video led police to identify the suspect vehicle in the homicide, which led the police to pull over co-defendant Rodriguez, the admitted driver of the suspect vehicle.

Statements from Rodriguez provided additional evidence of defendant's guilt. Rodriguez told police he dropped off defendant and Hernandez at Emeric Avenue and Hayes Street knowing they were going to shoot someone. Rodriguez saw defendant with a "40 Glock." After the shooting, defendant said he fired three or four shots but his gun jammed. Hernandez said he came back with no bullets and used his revolver, and he thought he shot the victim "in the ass." The evidence established the victim had suffered seven separate entry gunshot wounds throughout his body, including his buttocks. Rodriguez's statements establish that defendant and Hernandez went to the location where the victim was with the intent to shoot him.

Moreover, a search of defendant's home revealed red rosary beads and a search of his cell phone showed calls made to Hernandez's phone the morning of the murder, and also calls with Rodriguez's phone. At around

12

2:36 a.m. the day after the murder, defendant received a text message asking, "You finna be getting out of the Rich?" To this, defendant's phone responded, "Trying to. I got nowhere to go, period. 187." The number "187" represents the Penal Code section defining the crime of murder.

There also was evidence of motive. As recounted in detail above (*ante*, at pp. 5–6, 8), the victim was a member of a Sureño street gang who was targeted because he allegedly threw bottles at defendant, Hernandez, and Rodriguez. There was a serious conflict between Sureños and Norteños at that time, and Detective Brady opined this murder was a "clear" case in which disrespect of one gang was met with violence by another. For instance, tagging at a memorial for the Sureño gang victim was crossed out with tagging that stated " 'WSB got one.' " WSB is a Norteño gang, and there was evidence that Rodriguez, Hernandez, and defendant all associated to some extent with Norteños. Rodriguez admitted he had clothing items associated with WSB and knew people in or associated with that gang, including his sister. Hernandez had a red bandana in his room, and gang tagging specific to Norteños appeared in his room and backyard. As for defendant, he had a few pairs of red shoes, a red and black rosary, and red hats, including one hat with a huelga bird on it, a common symbol used by the Norteño street gang.

Considering the totality of the record, we find substantial evidence supporting the trial court's determination beyond a reasonable doubt that defendant directly aided and abetted the murder, by knowingly participating in the shooting of Hernandez. At the very least, the evidence establishes defendant acted with implied malice, by intentionally seeking the victim out while armed and intending to aid in the victim's shooting, and thereby acting in conscious disregard for human life. (See, e.g., *People v. Nieto Benitez*

13

(1992) 4 Cal.4th 91, 109–110 ["where the defendant obtains a lethal weapon and then engages the victim in an argument, malice may be implied"].)

### C. Defendant's Other Contentions

#### 1. Accomplice testimony

Defendant challenges the trial court's reliance on co-defendant Rodriguez's testimony on the ground that Rodriguez was an accomplice and his account of the events was not sufficiently corroborated. Specifically, he contends, there was no evidence corroborating Rodriguez's statements that defendant went with Hernandez to locate the victim while Rodriguez "simply dropped them off and went to the liquor store." We disagree.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) That said, "evidence corroborating accomplice testimony ' "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and " 'may be circumstantial or slight and entitled to little consideration when standing alone.' " ' " (*People v. Perez* (2018) 4 Cal.5th 421, 452.) " ' "The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 308.)

Here, it is undisputed that Rodriguez was an "accomplice" within the meaning of section 1111. Thus, the only question is whether there was sufficient corroborating evidence connecting defendant to the murder.

As already discussed in depth, there was plenty of evidence pointing to defendant's guilt, including the testimony of the eyewitnesses near the crime scene, the items found in defendant's home, the call logs from defendant's phone and Rodriguez's phone, and the evidence of motivation. All this was more than sufficient to connect the defendant to the crime independently of Rodriguez's testimony.

### 2. *Galios's Testimony Regarding the ShotSpotter Audio*

Defendant argues the trial court erred by allowing former Officer Galios to testify that he heard eight shots fired while listening to the ShotSpotter audio. Defendant contends there was no expert or other evidence explaining how the ShotSpotter technology worked in 2012, its margin of error, or its capacity to differentiate and characterize the sound of gunfire as distinguished from other sounds such as a car backfiring or fireworks. Relying on *People v. Hardy* (2021) 65 Cal.App.5th 312, defendant contends the ShotSpotter technology was sufficiently novel, and its reliability unestablished, to have required a *Kelly/Frye*[2] hearing. Moreover, he contends, "the prosecutor did not establish Galios' training or experience with the system to establish the reliability of his discernment of sounds of gunshots versus other sounds," nor had a foundation been laid to establish that the audio of the eight sounds was captured at the particular location and time of the victim's shooting.

---

[2] *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Frye*).

Initially, we note that Evidence Code section 353 requires an objection "so stated as to make clear the specific ground of the objection." The objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Here, when the prosecutor asked Galios how many shots he heard on the ShotSpotter audio, defense counsel stated: "I'm going to object as lack of foundation as it relates to what he heard in this case." Because defense counsel did not specifically mention *Kelly/Frye* or otherwise identify the basis of her foundational objection,[3] the review of the *Kelly/Frye* has been forfeited. (*People v. Diaz* (1992) 3 Cal.4th 495, 527 [objection on grounds of " 'lack of foundation' " and "hearsay" did not preserve the *Kelly/Frye* issue].)

But even assuming it was error to admit Galios's testimony, defendant fails to establish that a more favorable outcome was reasonably probable had the testimony been excluded. (*People v. Venegas* (1998) 18 Cal.4th 47, 93; *Kelly*, *supra*, 17 Cal.3d at p. 40 [applying *Watson*].) Defendant suggests the error was prejudicial because the trial court made a comment about it when denying the resentencing petition. Defendant, however, fails to provide a

---

[3] An objection on the ground of lack of foundation can encompass a number of different evidence rules, e.g., personal knowledge (Evid. Code, § 702), expert witness qualification (*id.*, § 720), and admissibility of lay and expert witness opinion (*id.*, §§ 800, 801). (See *id.*, §§ 403, 405 [preliminary facts].)

Though the trial court independently asked the prosecutor if a *Kelly/Frye* hearing was needed, defense counsel offered no objection or comment when the prosecutor explained that the seven gunshots found on the victim's body essentially corroborated Galios's determination that he heard eight shots fired on the ShotSpotter audio.

record citation supporting this claim. Our review of the record reveals that when the court denied the petition, it noted "there were seven entry wounds on the victim so it would appear that both gentlemen shot him" insofar as a "revolver would not hold more than five, possibly six" bullets. In any event, as discussed, even without the challenged testimony, substantial evidence established beyond a reasonable doubt that defendant directly aided and abetted the murder with implied, if not express, malice. The People were not required to prove that defendant fired the bullets that actually killed the victim, or that his bullets even hit their mark, to support this theory. We thus reject defendant's claim that the court prejudicially erred in admitting Galios's testimony.

### 3. *Lieutenant Wiegers's testimony regarding the entry wounds*

Defendant next contends Lieutenant Wiegers's testimony regarding the number of entry gunshot wounds on the victim's body lacked foundation and constituted inadmissible hearsay, as there was no showing Wiegers had sufficient expertise to make that determination and his opinion was based on what he was told by the coroner.

We provide some additional context here. Lieutenant Wiegers initially testified he has worked on well over a hundred homicide cases involving gunshot victims over the course of his career. Wiegers observed the victim's body at the hospital and later counted seven total gunshot wounds. Wiegers also documented the gunshot wounds at the autopsy.

After the People rested, the trial court invited the prosecutor to recall Wiegers to testify as to his experience in distinguishing between entry wounds and exit wounds. Wiegers testified on recall that through his training and experience as a police officer, he is familiar with gunshot wounds, including the difference between an entry and an exit wound.

17

Trajectory rods were used during the victim's autopsy, which showed the path that a bullet entered and exited the body. Wiegers made his "own personal determination" that the victim had seven separate gunshot wounds. Defense counsel indicated she had no cross-examination for Wiegers, but objected to the re-opening of his testimony, and also on grounds of lack of foundation and hearsay. Having anticipated and allowed further testimony regarding the gunshot wounds, the court implicitly overruled the foundation and hearsay objections.

We are not persuaded that Wiegers's recall testimony should have been barred as hearsay. As indicated, Wiegers concluded there were seven separate bullet wounds based on his own experience and personal observations. Defendant's assertion that Wiegers's "understanding was clearly based on what the coroner told him" is unsupported by the record.

Defendant's contention that Wiegers's testimony lacked foundation is likewise unavailing. Even if we were to overlook defendant's failure to specify the basis for the foundation objection (see Evid. Code, § 353), he has not shown the court abused its discretion in implicitly overruling the objection.

As the Evidence Code makes clear, a witness can give an expert opinion that is related to a subject "sufficiently beyond common experience" when that opinion is "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness." (Evid. Code, § 801.) "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. . . . [¶] A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own

18

testimony." (*Id.*, § 720.) "When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony." (*People v. Jones* (2013) 57 Cal.4th 899, 949–950.)

As the record reflects, Wiegers became familiar with the difference between entrance and exit wounds based on his training and experience as a police officer. Over the course of his career, Wiegers had worked on over a hundred homicide cases involving gunshot victims. Defense counsel did not cross-examine Wiegers concerning his experience. On this record, we cannot say the trial court abused its discretion in allowing Wiegers to testify that his examination of the victim's wounds led him to conclude that the victim had been shot seven times.

### 4. *Galios's testimony about defendant's text messages*

Former Officer Galios testified that text messages on defendant's cell phone shortly after the murder caught his attention. As relevant here, on August 27, 2012, at 2:36 a.m., a text message from defendant's phone number to an unknown person stated, "What's good? . . . [T]rying to get out of town." The unknown person responded, "You finna be getting out of the Rich?" Then defendant's phone number replied: "Trying to. I got nowhere to go, period. 187."

Defendant now contends the evidence was hearsay and did not fall within the party admission exception (Evid. Code, § 1220) because there was no evidentiary foundation establishing that he personally sent the text messages. This is meritless.

A writing, including a text message, must be authenticated before it may be admitted into evidence. (Evid. Code, §§ 250, 1401; *People v.*

*Goldsmith* (2014) 59 Cal.4th 258, 266.) To authenticate a writing, the proponent must introduce evidence sufficient to sustain a finding that it is the writing he or she claims it is, or establish such facts "by any other means provided by law." (Evid. Code, § 1400.) The proponent may rely on circumstantial evidence or the writing's own content to authenticate it. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.)

Here, Lieutenant Wiegers testified, without objection by the defense, that call logs for a cell phone found on defendant's bed stand showed calls were made between it and Hernandez's phone and Rodriguez's phone on the morning of the murder. Wiegers also searched Rodriguez's phone, and the number associated with defendant's phone was in Rodriguez's phone under the name "Jorge" (defendant's first name). This was more than sufficient to sustain a finding that the subject text messages were sent by defendant and therefore qualified as a party admission under Evidence Code section 1220.[4]

Defendant insists the prosecution provided no foundation to establish that he—and not one of his co-defendants or someone else—sent the text messages. But as the People point out, the defense presented no evidence suggesting that anyone else used the phone.

As for defendant's contention that the "prosecution did not provide the court a copy of the text message, nor did it establish that the criteria of Evidence Code section 1523 [were] met for Officer Galios to simply recite orally the content of the messages," there was no specific objection on this ground. As such, the contention was forfeited. (Evid. Code, § 353.)

---

[4] Though we need not rely on this, defendant also recited his phone number on video during his police interview, which the defense moved into evidence.

In sum, the trial court did not err in admitting the testimony concerning defendant's text messages.

### 5. *Defendant's youth*

Finally, defendant argues a remand is required because: he was 22 years old at the time of the shooting; youth is a relevant factor that a trial court must consider in determining whether a defendant acted with malice; and the record does not reflect the court considered defendant's youth.

It appears defendant has forfeited this claim. Defendant does not indicate that he made this argument below, and our review of the record does not show that he did. Although various documents before the trial court, including the court's own minute orders, reflected defendant's date of birth, defendant never presented any evidence concerning his youth at the time of the crimes. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)

Defendant urges that we exercise our discretionary authority to consider the issue. Defendant cites *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*) for its holding that youth—"defined, roughly, as being 25 years of age and younger"—may be one factor in the totality of the circumstances bearing on whether a defendant acted with implied malice and so could still be found guilty of murder at a section 1172.6 hearing. (*Id.* at pp. 416–417) Because *Pittman* appears to be the first case to clearly reach this holding, and because *Pittman* was not decided until after the trial court in this case denied the petition for resentencing, we will exercise our discretion to consider the relevance of youth here. (*Id.* at p. 416.)

In *Pittman*, the defendant, at the age of 21, was at a party with his two co-defendants who were around 16 and 17 years old, and all were drunk. (*Pittman*, *supra*, 96 Cal.App.5th at pp. 404, 418.) The defendant left the party momentarily, saw the victim doing drugs in a car, and devised a plan to

" 'whip [the victim's] ass.' " (*Id.* at p. 404.)  On the way to the victim's car, the defendant armed himself with a chisel from a neighbor's porch and provided chisels to his co-defendants.  One of the co-defendants stabbed the victim while the defendant threw his chisel, possibly hitting the victim.  (*Id.* at p. 405.)  Upon noting that no evidence of youth was addressed in the trial court at the section 1172.6 hearing, the Court of Appeal proceeded to consider whether "there is a reasonable possibility that the failure to consider [the defendant's] youth impacted the trial court's decision."  (*Pittman*, at p. 417.)  The court indicated "[i]nferences of immaturity and peer pressure" could be drawn from the ages of the defendant and his co-defendants.  (*Id.* at p. 418.)  Additionally, "the trial evidence indicates that [the defendant] and his peers acted impulsively and under the influence of 'transient rashness.'  The selection of chisels as weapons appears to have been spontaneous.  The acknowledged motivation for the crime was the happenstance that, while walking by his house, [the defendant] noticed [the victim] 'shooting up dope with a prostitute in his truck.' "  (*Ibid.*)  The court also noted the "material characteristics of youth are exacerbated" because the defendant and his codefendants were intoxicated and because of " 'negative emotional arousal' " and that "issues surrounding youth were discussed at [the defendant's] parole hearing."  (*Ibid.*)

Here, as in *Pittman*, the defense did not present any evidence concerning defendant's youth.  The record establishes defendant was 22 years old at the time of the murder, while his co-defendants were 19 years old.  The murder in this case occurred on the Sunday following the Friday when the victim allegedly threw bottles at Hernandez, Hernandez's young child, Rodriguez, and defendant.  There was no evidence of intoxication, and Hernandez and defendant waited more than a day after the victim allegedly

22

"disrespected" them to then arm themselves and call on Rodriguez to take them to the victim.  Nonetheless, "[i]nferences of immaturity and peer pressure" could be drawn from the ages of defendant and his co-defendants, as well as from the nature and timing of the murder and its motivating cause.  (*Pittman, supra*, 96 Cal.App.5th at p. 418.)

Taking our cue from *Pittman*, we conclude that youth was a factor for the trial court to consider at the resentencing hearing.  (*Pittman, supra*, 96 Cal.App.5th at p. 417.)  And because the matter was not addressed, we cannot rule out a reasonable possibility that the court's failure to consider the defendant's youth may have impacted its decision.  (See *ibid*.)  Accordingly, a remand is appropriate for the court to consider how, if at all, defendant's youth affected his ability to form the requisite mental state for murder.  We express no opinion as to the appropriate outcome on remand.

## DISPOSITION

The order denying the petition for resentencing is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

_____
Fujisaki, Acting P. J.


WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*People v. Anguiano* (A166206)

23